

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

DEC  3 2009

CLERK, U.S. DISTRICT COURT
By_____
        Deputy

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TYRONNE E. GRANT                        §
      PLAINTIFF,                         §
                                        §
v.                                      §        Civil Action No. 4:08-CV-455-Y
                                        §
MICHAEL J. ASTRUE                       §
COMMISSIONER OF SOCIAL SECURITY         §
      DEFENDANT                          §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28 United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff  Tyronne E. Grant ("Grant") filed this action for judicial review of a final decision

of the Commissioner of Social Security denying Grant's claims for supplemental security income

("SSI") benefits under Title XVI of the Social Security Act.  Grant applied for SSI benefits on May

4, 2005, alleging that his disability commenced on January 1, 2004.[1]  (Transcript ("Tr.") 9, 40.)

---

[1] The first month for which SSI benefits can be paid is the month following the month in which the
application was filed regardless of how far back in time disability may extend. 20 C.F.R. § 416.335.  Additionally,
the onset date of January 1, 2004, submitted by Grant in his May 4, 2005 application, fell within the period of
assessment for a prior application for SSI benefits that Grant had submitted on December 16, 2002, which was
denied on March 4, 2004. (Tr. 9.)  The ALJ interpreted the overlap in dates to be an implicit request to reopen the
dismissal of Grant's 2002 claim, which the ALJ declined to do. (Tr. 9-10.)  Pursuant to 20 C.F.R. § 416.912(d), the

The Social Security Administration denied Grant's application initially and on reconsideration. (Tr. 9.) Grant requested a hearing before an administrative law judge ("ALJ"), and the ALJ held a hearing on July 10, 2007. (Tr. 306.) At the hearing, Grant, who was represented by counsel, testified on his own behalf, and a vocational expert also testified. (*Id.*) On January 17, 2008, the ALJ denied Grant's application for benefits. (Tr. 7-21.) The Appeals Council denied Grant's request for review on April 21, 2008. (Tr. 3.) After receiving an extension of time to file for court review of the Commissioner's decision, Grant timely filed his petition for review.

B.     STANDARD OF REVIEW

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, Courts use a five-step analysis. 20 C.F.R. § 416.920. First, the claimant must not be presently working at any substantial gainful activity. *Id.* § 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. *Id.* § 416.920(c); *Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000) (citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985)). At the third step, disability will be found if the claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. 20 C.F.R. § 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical

_____

ALJ considered Grant's entire record in his decision.

MEMORANDUM AND ORDER Page 2 of 16

status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 416.920(e). Finally, in order to qualify as disabled the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 416.920(f); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant meets his burden, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Charter*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* The court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but instead should carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

C.     ISSUES

MEMORANDUM AND ORDER Page 3 of 16

1.      Whether the ALJ's decision at Step Two comports with relevant legal standards; and

2.      Whether the ALJ's determination that Grant was capable of performing other work, and therefore not disabled, is supported by substantial evidence.

D.     ADMINISTRATIVE RECORD

1.     Background and Vocational History

Grant was 36 years old at the time of filing of his application for disability.  He did not complete high school and failed to pass the General Equivalency Development Test.  (Tr. 48, 310–11.) Grant participated in, but did not complete, two job-training programs. (Tr. 48, 311–12.) Grant's employment history is sporadic, consisting mainly of positions involving menial labor.  (Tr. 36–39, 44–45, 50–54, 312–13, 319.) On several occasions, Grant indicated that his criminal history, including convictions for the possession and sale of drugs, prevented him from finding gainful employment.  (Tr. 13, 98, 312, 314–16.)

2.     Medical and Treatment History

Because Grant had previously filed a disability claim, a large, cumulative body of medical evidence spanning the years from 2002 to 2007 is included in the record.[2]  The administrative transcript reflects that Grant is asthmatic, obese, has hypertension, and has disc dessication at L5-S1 of his lumbar spine.  (Tr. 11, 13, 46, 67, 70, 173, 203, 205, 208–09, 293, 302, 316, 320, 324, 325–26.) Grant has also been diagnosed with, and takes medication for, several psychiatric disorders

---

[2] Because Grant's claims in the instant appeal focus solely on the ALJ's alleged error in concluding that Grant's mental impairment was not severe, the court will give Grant's physical impairments minimal attention. Therefore, the Medical and Treatment History will focus on items relevant to assessing Grant's mental capabilities.

including: 1) major depression with psychotic features, 2) a personality disorder with antisocial personality traits, and 3) a history of cocaine-induced psychotic disorder. (Tr. 15-19a.) Additionally, Grant complains of chronic lower back and chest pain. (Tr. 82, 91, 108, 124, 142, 146, 164, 170–71, 173, 195–97, 247, 265, 285, 287, 293, 317, 319.) The record also indicates that Grant has a history of noncompliance with taking his medication and the use of illegal drugs. (Tr. 97, 98, 103, 106–07, 110, 112, 118, 120, 126, 127, 128, 137, 139, 141, 145, 149, 153, 160–63, 166, 170–72, 174–75, 179, 197, 199, 200, 207A, 208, 211, 222–23, 227, 235, 247, 264, 270–73, 285, 302.)

The transcript includes conflicting medical assessments of Grant's mental capabilities, ranging in classification of Grant as limited in capability to mild-to-moderately impaired. (Tr. 188–92, 237–50.) The transcript contains a longitudinal view of Tarrant County Mental Heath and Mental Retardation Services ("MHMR") medical and social worker assessments and status reports documenting Grant's mental state, limitations, and capabilities from 2002 through 2006. (Tr. 40–87, 92, 95, 96, 98–101, 103–04, 106, 115–20, 123, 126–27, 133–34, 137, 139, 141, 143, 145–153, 156–58, 166–69, 170–86, 256–289.)

Grant's longest documented relationship with a health care provider is with MHMR. The earliest assessment of Grant by MHMR in the record is November 4, 2002. (Tr. 166.) On that date, MHMR staff conducted a Mental Health Adult Annual Survey Uniform Assessment Summary, which included an assessment of Grant using the Multnomah Community Ability Scale ("MCAS"). (*Id.* 166, 168.) Grant scored low on several factors, but his intellectual functioning was rated a 5 on a 5 point scale (with 1 being the lowest rating) and his intellectual functioning was assessed at

at normal or above-level.[3]  (*Id.* 168.)  Additionally, Grants scores indicated that he often performed independently in his daily life.  (*Id.*)  None of the monthly MHMR progress notes following the assessment indicated that Grant exhibited sub-average intellectual functioning or decomposition. (Tr. 106-110, 115–121, 122–124, 125–130, 133–151.)

On November 25, 2003, MHMR staff completed a Mental Health Adult Uniform Assessment for Benefit Design, which included MCAS scores for Grant on that date.[4]  (Tr. 99–101.)  Grant again scored the highest possible ranking on the test's intellectual functioning factor. (Tr. 100.)  Moreover, no mental impairment is indicated in the monthly progress notes following the November 25th assessment. (*See, e.g.,* Tr. 92–98.)

During Grant's period of treatment with MHMR, the staff reported that he worked part-time as a janitor and that he requested and received two bus passes from MHMR, but that Grant repeatedly refused to attend substance abuse counseling and varied between admitting and denying use of illegal drugs.  (*See, e.g.,* Tr. 95, 107, 115, 118, 127, 134, 143, 145, 147, 151, 163.)  Grant tested positive for marijuana and cocaine on several occasions.[5]  (Tr. 112, 137, 160.)

---

[3] Guidance for completing the Multnomah Community Ability Scale provides that a "5" on the Intellectual Functioning factor equates to an intelligent quotient of 90 or above and is applicable to an individual that is well oriented and demonstrates cognitive skills in the interview.  SELA BARKER ET AL., NETWORK BEHAVIORAL HEALTH AND MULTNOMAH COUNTY, OREGON, 1994, MULTNOMAH COMMUNITY ABILITY SCALE 3, http://www.sheppardpratt.org/Documents/MCAS%20Anchors-Aug-2000.pdf (incorporating elaboration on anchors by: Faith B. Dickerson et al., as published in 39 COMMUNITY MENTAL HEALTH J. Apr. 2003, at 131–137), attached hereto as Exhibit A.

[4] The November 25, 2003 MCAS scores were compiled by a different MHMR staff member than had compiled the November 4, 2002 scores.  The staff member compiling the November 25, 2003 scores began reporting on Grant's progress on July 7, 2003.  (Tr. 119.)

[5] The results on August 21, 2003 indicate that although the quantity of the urine specimen that Grant provided was insufficient for confirmation, the preliminary analysis markers indicate a "presumptive positive" that Grant's system contained traces of both marijuana and cocaine. The results indicate that the test was to be repeated, but no follow-up testing documentation or results are contained in the record.

MEMORANDUM AND ORDER Page 6 of 16

In a Daily Activity Questionnaire ("DAQ") dated September 28, 2005, Grant indicated that he lived with his grandmother and attended church but did not perform any household tasks such as cooking or cleaning. (Tr. 74–78.) In another, undated DAQ, however, Grant reported assisting his grandmother with her mobility, cooking, cleaning, doing the laundry, and taking the bus. (Tr. 61–62.) He also indicated that if he failed to write things down he would forget them. (*Id.*)

MHMR progress notes on Grant end in early 2004 due to Grant's incarceration. (Tr. 92.) On May 13, 2004 Grant was discharged from MHMR because his disorder was deemed to be outside of the MHMR target population (Tr. 90–91.) After his discharge, the transcript reflects two MHMR progress reports: one dated August 12, 2004, indicating that Grant did not appear and containing a note to refer Grant to JPS; and one dated September 28, 2004, also indicating that Grant failed to show up for his appointment. (Tr. 88, 89.)

On July 9, 2005, at the SSA's request, Grant underwent a Psychological Exam with I.Q. and Mental Status evaluation administered by Kristi Compton, a clinical psychologist employed by the Medical Testing and Examination Centers of Fort Worth. (Tr. 187–192.) Without benefit of any of Grant's medical records or treatment history, Compton administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") to Grant. (Tr. 187.) Grant scored a verbal intelligence quotient ("I.Q.") of 55, a performance I.Q. of 60, and a full-scale I.Q. of 53. (Tr. 188.) Compton surmised that because Grant "appeared to put forth his best effort" that the results accurately reflected his capabilities. (*Id.*)

Compton also administered the Wide Range Achievement Test-Revision 3 to assess Grant's academic skills. (*Id.*) Grant's scores placed him in the first-grade range of abilities "in all areas."

(Tr. 189.)  During his evaluation, Grant stated that he did not perform household chores such as cleaning or cooking, did not know how to cook, could not use a washing machine, and that he did not utilize public transportation because he did not understand how to catch a bus.  (*Id.*) Additionally, Grant told Compton that he did not know why he was incarcerated, denied using alcohol, and stated that a friend once tried to make him do crack.  (*Id.*)  In conclusion, among other findings, Compton indicated that Grant appeared to function in the subaverage intellectual range, had mild mental retardation, and suffered from major impairments to occupational, social, and economic functioning.  (Tr. 190–91.)

On August, 4, 2005, J.D. Marler, a clinical psychologist, reviewed Grant's record and completed a Psychiatric Review Technique Form ("PRTF").  (Tr. 227.)  Assessing Grant under Listing 12.05 of the Listing of Impairments, Marler indicated that Grant suffered from mild mental retardation which, although medically determinable, did not "precisely satisfy" Listing 12.05's diagnostic criteria.[6]  20 C.F.R. Pt. 404, Subpt. P. App. 1; (Tr. 231.)  Marler noted that there was no evidence that Grant demonstrated onset before the age of 22, and that prior to Compton's evaluation there was no previous mention of limited intellectual functioning in Grant's medical records.  (*Id.*) Further, in his assessment of Grant's functional limitations, Marler indicated that Grant had moderate restriction of his activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of extended decomposition.  (Tr. 237.)  Marler further noted that Grant's presentation at the clinical examination by Compton is not

---

[6]  Marler indicated that a residual functional capacity assessment was necessary based upon several listings: 12.04 Affective Disorders, 12.05 Mental Retardation, and 12.09 Substance Addiction Disorders.  (Tr. 227.)

supported by other evidence of record.  (Tr. 239.)  Finally, in his residual functional assessment,

Marler indicted that Grant had the ability "to carry out simple instructions, relate adequately [and]

adapt to changes in his work setting." (Tr. 243.)  Marler's findings in the PRTF were reviewed and

validated on October 19, 2005 by a second clinical psychologist, Wallace Lee.  (Tr. 245.)

       3.     Hearing

At the hearing before the ALJ, Grant was able to recall historical events with a high degree

of specificity and accuracy.  For example, Grant testified that he (1) was not placed in special

education classes while in high school, (2) missed passing the GED by just 4 or 5 points, and (3) last

worked in July or August of 2004. (Tr. 311–12, 321.) Grant was also able to recall details of his

arrest and drug convictions in 2003 as well as the reasons why he did not receive work assignments

during either incarceration period. (Tr. 314–18.)  Grant also testified that he could not read.  (Tr.

322.)  When the ALJ asked Grant to clarify his testimony based on contradictory statements Grant

had previously made to MHMR, Grant did not directly answer the ALJ's questions and stated that

he did not do much reading. (*Id.*)

A vocational expert ("VE") also testified at the hearing.  The ALJ instructed the VE to

consider a hypothetical individual with Grant's work history who was able to perform a full range

of physical tasks, had a tenth grade education, but only read and wrote at an elementary school level.

(Tr. 328.)  Additionally, the ALJ requested that the VE limit consideration to jobs with no more than

incidental public contact, reason development of 1 or 2 as defined in the Dictionary of Occupational

Titles, and to assume the individual could not perform any of Grant's past relevant work.  (Tr. 328.)

In response, the VE indicated that the hypothetical individual could be employed in unskilled

positions such as a Machine Tender at the light level and a Hand Packer at the light and medium levels. (Tr. 328.) Indicating that those were entry-level positions, the VE estimated that for both of these jobs 180,000 positions existed in the national economy and 14,000 position existed in Texas. (Tr. 329.) The VE confirmed that reading and writing were not required for either position, and stated that even if the hypothetical individual were illiterate it would not significantly change the individual's ability to perform in either position or the number of positions available. (Tr. 329–30.)

4.    ALJ's Decision

The ALJ found that Grant had not engaged in substantial gainful activity after January 1, 2004. (Tr. 11.) Without providing any discussion or insight into his analysis at Step Two, the ALJ found that Grant had multiple severe impairments: asthma, obesity, hypertension, disc desiccation at L5-S1 of his lumbar spine, drug dependence, major depression with psychotic features, a personality disorder with antisocial personality traits, and a history of cocaine-induced psychotic disorder and alcohol dependence. (*Id.*) The ALJ then determined that none of Grant's impairments, alone or in combination, were found to meet or medically equal the criteria of any listed impairment. (*Id.*) As to Grant's mental impairments, the ALJ stated that Grant's "most significant problems involved his mental impairments." (Tr. 15.) The ALJ further found that Grant had the following limitations under the "B" criteria of 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sect. 12.00: moderate restrictions to his activities of daily living, moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (*Id.*)

Finding that Grant could not perform any of his past relevant work, the ALJ determined that

MEMORANDUM AND ORDER Page 10 of 16

Grant had the residual functional capacity (RFC) for unskilled labor with no exertional or nonexertional physical limitations as long as the work did not involve reasoning development beyond level 1 or 2 (as defined in the Dictionary of Occupational Titles) and required no more than incidental contact with the public. (Tr. 12.)  Based on the VE's testimony, the ALJ found that other work existed in the national economy that Grant could perform.  (Tr. 19A–20)  The ALJ concluded that Grant had not been under a disability at any relevant time through the date of his decision.  (Tr. 21.)  Accordingly, the ALJ concluded that Grant was not disabled and was not entitled to SSI payments.

E.      DISCUSSION

     1.      Issue One

As to the first issue, Grant contends that remand is required because the ALJ failed to apply the correct legal standard in assessing the severity of his mental impairment at Step Two of the sequential analysis.[7]

The Commissioner has issued regulations that define a severe impairment as one which significantly limits a claimant's physical or mental ability to do basic work activities.  20 C.F.R. §

---

[7] In support of his argument, Grant expressly states that he does not claim that the evidence supports an independent finding of early onset of his alleged mental impairment. (Pl. Br. at 7–8; Pl. Reply Br. at 2.)  Grant contends, however, that the U.S. Court of Appeals for the Fifth Circuit does not require early onset to find that an intellectual impairment qualifies as a disability under Listing 12.05 of the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. (Pl. Br. at 7.)

Although the court will not directly address this Step Three issue as the court is remanding the case for a legal error occurring at Step Two, the court notes that, subsequent to Grant's petition, the Fifth Circuit addressed the early-onset question directly, holding that to qualify under Listing 12.05 a claimant must provide evidence that independently demonstrates or supports early onset. *Randall v. Astrue*, 570 F.3d 651, 659–60 (5th Cir. 2009) (affirming that a claimant's failure to independently prove early onset precluded a finding of disability under Listing 12.05).

416.920(c).  The Fifth Circuit, however, has found that a literal application of that definition is inconsistent with the statutory language and legislative history of the SSA because the regulation includes fewer conditions than indicated by the statute. *Stone*, 752 F.2d at 1104-05.  Accordingly, the Fifth Circuit has established the following standard for determining whether a claimant's impairment is severe: An impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or experience. *Id.* at 1101.  The courts are to presume the ALJ used an incorrect standard for measuring severity if the decision fails to refer to the *Stone* opinion or its progeny by name or fails to cite language of the same effect. *See Loza*, 219 F.3d at 393.  A case will not be remanded simply because the ALJ did not use "magic words." *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986)).  But remand is required where there is no indication that the ALJ applied the correct standard. *Hampton*, 785 F.2d at 1311; *Stone*, 752 F.2d at 1106; *Sanders v. Astrue*, 2008 WL 4211146, at *8 (N.D. Tex. Sept. 12, 2008); *see also McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 835 (N.D. Tex. 2007) (indicating that in *Stone* the Fifth Circuit's remand mandate left lower courts with no discretion to conduct harmless error analysis to determine if remand was proper when the ALJ failed to apply the *Stone* severity standard).

At Step Two of the evaluation, the ALJ found that Grant had "major depression with psychotic features, drug dependence, a history of alcohol dependence, a personality disorder with antisocial personality traits, a history of cocaine-induced psychotic disorder, asthma, hypertension, obesity, and disc desiccation at L5-S1 of his lumbar spine." (Tr. 11.) Citing only section 416.920(c) of Title 20 of the Code of Federal Regulations, the ALJ indicated that Grant had a "'severe'

combination of impairments." (Tr. 11.)  While the ALJ's decision contains lengthy discussions about Grant's claims and medical history vis-a-vis the ALJ's determinations at Steps Three through Five, the ALJ does not discuss his assessment of the severity of Grant's mental illness relative to the appropriate regulations.[8]  Moreover, even though the ALJ failed to find a severe mental impairment at Step Two, the ALJ's assessment of Grant's restrictions or difficulties in his mental functions appear sufficient to qualify as severe at Step Two. (Tr. 15.)  Finally, in discussing Grant's actions relative to Grant's assessment of his own mental impairments, the ALJ used the term "significant" suggesting application of the CFR standard and not the *Stone* ("slight impairment") standard.  (Tr. 19A.)

The Commissioner asserts that any error made by the ALJ at Step Two is harmless.  First, the Commissioner argues that the *Stone* standard does not apply because the ALJ did not deny benefits at Step Two and considered Grant's mental impairment at later steps in the analysis.  This argument fails because the proper denial of benefits later in the process does not excuse an ALJ's earlier error.  *See, e.g., Loza*, 219 F.3d at 393, 398-99 (finding that remand was required because the ALJ did not apply the correct standard as to the claimant's mental impairments as set forth in *Stone* even though the ALJ had adjudicated the claim through Step 5); *Bragg v. Comm'r of Soc. Sec. Admin.*, 567 F. Supp. 2d 893, 907 (N.D. Tex. 2008) (noting that thorough analysis of evidence under erroneous severity standard does not cure the procedural defect in the ALJ's decision).

Further urging the court to look beyond the "magic words" required by *Stone*, the

---

[8] The regulations provide specific guidance for the assessment of the mental impairments at all stages of the sequential analysis.  20 C.F.R. § 416.920a.

commissioner claims that Grant's mild mental retardation was not severe under the *Stone* severity standard, citing the Fifth Circuit's unpublished decision in *LeBlanc v. Chater*, 83 F.3d 419, 1996 WL 197501, at *2 (5th Cir. 1996).  (Def. Br. at 13.)   In *LeBlanc*, the court found that the medical evidence in that case indicated that remanding in light of the "slight impairment" standard would be a waste of judicial resources where evidence established that both the *Stone* standard and the standard set forth in the C.F.R. were satisfied and the outcome would remain the same.  (Def. Br. at 13.)  In the instant case, however, the evidence in the record does not make it clear that the outcome would remain the same if the correct standard were applied, and remand is required.  *See, e.g.*, *Hampton*, 785 F.2d at 1311; *Stone*, 752 F.2d at 1106; *Sanders*, 2008 WL 4211146, at *8; *McNair*, 537 F. Supp. 2d at 835.

Remand is appropriate to allow the Commissioner to clarify that the *Stone* opinion was followed and to revisit whether a mental impairment should have been included among Grant's severe impairments at Step Two.

2.    Issue Two

Grant's second issue for review is that the ALJ erred in determining that Grant was capable of performing other work, and therefore not disabled.  Because remand is necessary to clarify that the correct legal standard was used, it is unnecessary, and likely premature, to perform an analysis on whether the ALJ's decision to deny Grant benefits is supported by substantial evidence.

RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings.

MEMORANDUM AND ORDER Page 14 of 16

## NOTICE OF RIGHT TO OBJECT TO PROPOSED

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

## AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending this deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation until December 24, 2009, The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until December 24, 2009 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the

MEMORANDUM AND ORDER Page 15 of 16

filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED DECEMBER 3, 2009.

CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT A

# MULTNOMAH COMMUNITY ABILITY SCALE

Sela Barker, Nancy Barron, Bentson McFarland, Douglas Bigelow
Network Behavioral Health and Multnomah County, Oregon, 1994

## ITEM ANCHORS
### *Includes suggested interview questions*

Base all scores on the past **1 month**

Anchors elaborated by Faith B. Dickerson, Ph.D., Andrea E. Origoni, B.A., and Andrea Pater, B.A., Sheppard Pratt

Health System, Baltimore, Md.; Barrie K. Friedman, LCSW-C, St. Luke's House Inc., Bethesda, MD; William A.

Kordonski, M.A., Alliance, Inc., Baltimore, Md. *Community Mental Health Journal*, Volume 39; April 2003, 131-137

Anchor elaborations appear in *italics*.

## MCAS 1.  Physical Health

How impaired is the client by his/her physical health status? NOTE: Impairment may be from chronic health problems and/or frequency and severity of acute illnesses.

Some chronically mentally ill people misinterpret or don't experience symptoms or health problems, so it is important to verify the status of a client's health from other data on physical condition if at all possible. Many chronically mentally ill clients are scored **5** because their disability is psychiatric and not physical. Remember that a health condition is not the same as a health impairment. Some examples are that a controlled seizure condition would be scored **4** and a poorly controlled or uncontrolled seizure condition would be scored at **less than 4**, depending on the severity and lack of control. Think about how the condition affects functioning on a day-to-day basis.

**1 = Extreme health impairment**     *(Major medical problem that precludes client's participation in most daily activities)*

**2 = Marked health impairment**      *(Major medical problem that interferes with most of client's activities, e.g., multiple sclerosis that requires use of walker)*

**3 = Moderate health impairment**    *(Medical problem that interferes some with client's activities, e.g., an uncontrolled seizure condition)*

**4 = Slight health impairment**      *(e.g., Controlled seizure condition or recent tooth abscess)*

**5 = No health impairment**


*\*\*\* Basis for rating:*

*Consider the following questions:*

*In the past month, how has your physical health been?  If client is unsure, provide options: very good, good, fair, poor, etc.*

*Do you suffer from any medical problems?  Such as diabetes, high blood pressure, etc?*

*What kinds of medical treatment are you being given? Are the treatments working?*

*Does your medical problem interfere with your day-to-day life?*


*CUE TO RATERS:*
*A rating of 2 is limited to a person who has a pervasive health problem, e.g., walks with a walker, constant breathing problems, etc.*

**MCAS 2.  Intellectual Functioning**

What is the client's level of general intellectual functioning? NOTE: Low intellectual functioning may be due to a variety of reasons. It should be distinguished from impaired cognitive processes due to psychotic symptoms, which are covered in later questions. Rate estimated IQ independent of psychotic symptoms.

In the absence of tested intelligence, estimate the level of intellectual functioning from your observation of their reading and other cognitive abilities. Since the scale is intended to measure clinician's perception, rate the item in terms of your perception of the client's intellectual functioning (independent of psychotic symptomatology).

| | |
|---|---|
| **1 = IQ < 60** | **Extremely low intellectual functioning** *(Not literate)* |
| **2 = IQ in the 60's** | **Moderately low intellectual functioning** *(Mild mental retardation or has literacy problems or major deficits in orientation)* |
| **3 = IQ in the 70's** | **Low intellectual functioning**  *(Borderline intellectual functioning; very limited conceptual thinking; 2 or more deficits in orientation)* |
| **4 = IQ in the 80's** | **Slightly low intellectual functioning** *(Low average I.Q.; mild deficits in orientation)* |
| **5 = IQ in the 90's & above** | **Normal or above level of intellectual functioning**  *(Well oriented, cognitive skills demonstrated in interview)* |

*** *Basis for rating:*

*Observation of client's general intellectual skills, apart from psychotic symptoms or thought disorder. Observe client's vocabulary and conceptual thinking.*

*Some questions that may be asked:*

*What is the highest grade that you completed in school?*
*(Ask only if less than a high school education: Did you ever receive any special education?)*

*Can you tell me today's date?*
*What is your address?  Your phone number?*
*Can you tell me who is the President of the United Sates?*

*CUE TO RATERS:*
*Focus on orientation questions, not IQ.*

**MCAS 3.  Thought Processes / Psychosis**

How impaired are the client's thought processes as evidenced by such symptoms as hallucinations, delusions, tangentiality, loose associations, response latencies, ambivalence, incoherence, etc.?

Consider the client's ability as he/she is <u>when rated</u>, whether that be on or off medications, independent of other services. If the client has changed within the time period rated, use the most recent condition.

| | |
|---|---|
| **1 = Extremely impaired thought processes** | *(Speech word salad or inability to focus on anything but psychotic ideas)* |
| **2 = Markedly impaired thought processes** | *(Speech which is difficult to follow or preoccupation with psychotic ideas)* |
| **3 = Moderately impaired thought processes** | *(Hallucinations, delusions, or disorganization which interfere with functioning some of the time)* |
| **4 = Slightly impaired thought processes** | *(Mild hallucinations or disorganized thinking or occasional delusional thinking)* |
| **5 = No impairment, normal thought processes** | |

***\*\*\*Basis for rating:***

*Rater's observation of the person's disorganized thinking.*

*Some questions that might be asked include:*

*Now I'd like to ask you about some symptoms that some people have:*
*Do you hear voices that others cannot hear?*
        *If yes: inquire about frequency of voices, what voices consist of and how much the voices*
        *interfere with daily activities. How much do the voices bother you?*
*Do you see things that others cannot see?*
        *If yes: inquire about frequency and content of visual hallucinations.*
*Do you believe the radio or TV communicates with you?  Do you receive messages from God?*
        *If yes to either question: inquire about frequency and content of communication.*
*Do you have special powers that other people do not have?*
*Can you read others' minds?*
*Do you ever feel/think that others can tell what you are thinking?*

*Have you been concerned that people are trying to harm you or interfere with you in any way?*
*Do you trust most people?  If not, why?*
*How do you compare yourself to other people?  Do you have special gifts or abilities?*
*Are you a religious person?*

***CUE TO RATERS:***
*Reserve a rating of 2 for a person who is absorbed by psychotic ideas.*

**MCAS 4.  Mood Abnormality**

How abnormal is the client's mood as evidenced by such symptoms as constricted mood, extreme mood swings, depression, rage, mania, etc.  NOTE: Abnormality in this area may include any of the following: range of moods, level of mood, and/or appropriateness of mood.

1 = **Extremely abnormal mood**          *(Despondence or uncontrolled mania or rage)*
2 = **Markedly abnormal mood**           *(Mania or marked irritability or severe depression)*
3 = **Moderately abnormal mood**         *(Moderate depression or marked blunted affect or*
                                          *significant irritability or passive suicidal ideation)*
4 = **Slightly abnormal mood**           *(Mild depression or mild blunted affect or mild irritability)*
5 = **No impairment, normal mood**

***Basis for rating:**

*Consider these questions when rating this item:*

*In the past month, how has your mood been?  Have you been feeling sad or down?*
*How depressed have you been?*
         *If yes: inquire about frequency, cause and severity of negative feelings.*

*Has your sadness/depression interfered with your participation in activities, your sleep or your appetite?*

*Have you felt dead inside?*

*Have you felt life wasn't worth living?  Have you had any suicidal or self-destructive thoughts recently?  If yes: follow-up.*

*Have you been feeling irritable?  Have you been snapping at other people?  Have you had a problem with your temper?*

*If mood has not been sad/down: inquire about possible manic or hypo-manic symptoms.*
         *Have you been feeling exceptionally happy without any reason?  If so, how long does it last?*
         *Have you been feeling on top of the world – like everything is great, feeling high (but without drugs)?*

**CUE TO RATERS:**
*If the person has any passive suicidal ideation (e.g., the person wishes they were dead sometimes), consider a rating of 3.*

**MCAS 5.  Response to Stress and Anxiety**

How impaired is the client by inappropriate and/or dysfunctional responses to stress and anxiety?
NOTE: Impairment could be due to inappropriate responses to stressful events (e.g., extreme
responses, or no response to events that should be of concern) and/or difficulty in handling anxiety
as evidenced by agitation, perseveration, inability to problem-solve, etc.

The client's response to work, living independently, changes in life status, family discord,
interpersonal conflict, new social demands, etc., may reveal an impaired response to normal stressors.
A client may become hostile or aggressive, self-destructive, antisocial, or have other outward
manifestations or poor coping.  A client may also withdraw or actively isolate him/herself.  Pay
special attention to the quieter manifestations which may be less obvious or socially troublesome but
are still dysfunctional for the client.

**If client is in an intensive residential program (>16 hrs./day), rating should be 3 or less.**

**1 = Extremely impaired response**  *(Extreme reactiveness to stressors, from acting out to*
                                       *paralysis, resulting in the inability to adapt)*
**2 = Markedly impaired response**  *(Marked reactiveness; very limited problem solving in*
                                       *response to stress; need for large amount of support and*
                                       *intervention from others; daily panic attacks or severe*
                                       *anxiety)*
**3 = Moderately impaired response**  *(Moderately reactive to stress; needs assistance in order to*
                                       *cope)*
**4 = Slightly impaired response**  *(Somewhat reactive to stress, has some coping skills,*
                                       *responsive to limited intervention)*
**5 = Normal response**

***\*\*\*Basis for rating:***

*Consider the following questions:*

*In the past month, have you felt anxious or tense?*
    *If yes: inquire about cause, frequency and severity of anxiety.  Ask about physical symptoms of*
    *anxiety and whether they have panic attacks.*
*Has your anxiety interfered with your day-to-day activities, sleep or appetite?*
*Do you ever use a PRN medication?*
*What stresses have you had lately?  (Give examples of stresses – problems where you live, with*
    *people, with money, etc.)  How stressed have you been feeling?*

*Also rate behavioral manifestations of anxiety during the interview.*

***CUE TO RATERS:***
*If the person has severe anxiety such as daily panic attacks, consider a rating of 2.*

**MCAS 6.  Ability to Manage Money**

How successfully does the client manage his/her money and control expenditures?

If there is no indication that the client has any trouble managing money, assume that she/he manages it successfully. If the client only manages a slight amount of money because most of it is managed by someone else, rate **below 3.** If the client only manages a slight amount because that is all she/he could have, rate **lower**; if she/he is managing a small amount because that is all she/he has left over after rent and food, rate somewhat **higher**. Rate what clients ARE doing, not what they MIGHT do if they had a chance. If a client is not managing money, she/he cannot be scored higher than a **1 or 2.**  Ask client if they have a checking account and if they pay their own bills which would indicate a rating of **4 or 5** depending on their need for assistance.

**1 = Almost never manages money successfully**     *(Only manages pocket money)*
**2 = Seldom manages money successfully**               *(Only manages money which is handed out daily)*
**3 = Sometimes manages money successfully**        *(Money doled out weekly by supervised housing*
                                                                                *or family; can buy food, cigarettes and manage*
                                                                                *that money ok; or manages money on own, but*
                                                                                *with difficulty)*
**4 = Manages money successfully a fair amount of the time**  *(Does more than a rating of 3 - i.e.,*
                                                                                            *pays for rent, treatment or other bills*
                                                                                            *by self - or manages all monthly bills*
                                                                                            *with assistance)*
**5 = Almost always manages money successfully**    *(Generally independent in managing money)*

***\*\*\*Basis for rating:***

*Consider the following questions:*

*Where are you living now?*
*Do you live with family or roommates?  Who owns your apt/house, etc?*
*How do you support yourself?  Does the money come to you, or is someone else the payee?*
*Do you pay the bills at your apt., home, etc.?*
*Does your care-provider/staff/family give you spending money?  If yes: How often do you receive*
        *money from them (e.g., weekly, daily)?*

*Are you currently employed?  If so: details?*
*Do you have a bank account?*
*Does your money last the whole week/month, or do you find that you run out of money early?*
*Does someone help you budget your money?*

***CUE TO RATERS:***
*How often the person receives his/her money is the key issue.*

**MCAS 7.  Independence in Daily Living**

How well does the client perform independently in day-to-day living? NOTE: Performance includes personal hygiene, dressing appropriately, obtaining regular nutrition, and housekeeping.

If a client resides in a residential care facility or is hospitalized, the rating would be **3 or less.**

**1 = Almost never performs independently**    *(Minimal to no ADLs even with repeated staff interventions)*

**2 = Often does not perform independently**    *(Completes only some ADLs, even with prompts and direction)*

**3 = Sometimes performs independently**    *(Needs consistent prompts for ADLs, but usually does complete most of them)*

**4 = Often performs independently**    *(May need occasional prompts or has difficulty in one area of ADLs)*

**5 = Almost always performs independently**

***\*\*\*Basis for rating:***

*Consider the following questions:*

*Is there someone who helps you with cooking or cleaning or who reminds you about taking care of your hygiene?  Who?*

*How often do you do your laundry?*
    *...go grocery shopping?*
    *...cook for yourself?*
    *...take a bath or shower?*
    *...clean up around the apartment/house?  It is usually messy or do you keep it neat?*

*How much help do you receive with these tasks?*

*Base rating also on your observation of the person and their general grooming.*

***CUE TO RATERS:***
*If the person needs only occasional help and in only one area of 'ADLs' ('Activities of Daily Living'), then consider a rating of 4.*

## MCAS 8.  Acceptance of Illness

How well does the client accept (as opposed to deny) his/her psychiatric disability?

You may wish to ask the client about this issue prior to rating the item. Some insight into or verbal admission of the client's mental illness is necessary for a high rating. Remember that issues of medication compliance and compliance with treatment are rated in items 14 and 15 and should not be considered in this question. An attitude of non-acceptance of illness is considered denial to the extent that it interferes with treatment.

**1 = Almost never accepts disability**          *(Adamantly denies illness and need for treatment)*
**2 = Infrequently accepts disability**          *(Consistently misunderstands illness or symptoms)*
**3 = Sometimes accepts disability**             *(Some denial evident in attributing problems to external*
                                                                       *factors or minimizing seriousness or denying specific*
                                                                       *symptoms)*
**4 = Accepts disability a fair amount of the time**    *(Much of the time acknowledges having an*
                                                                       *illness and/or some specific symptoms)*
**5 = Almost always accepts disability**         *(Identifies illness and symptoms consistently)*


***\*\*\* Basis for rating:***

*Consider these questions when rating this item:*

*Could you tell me about your psychiatric problems?*

*Can you tell me what your psychiatric diagnosis is?  What does that consist of?  How serious do
       you think it is?*

*What (psychiatric) symptoms do you have?*

*Do you take (psychiatric) medication?  How does your medicine help you ?*


***CUE TO RATERS:***
*If the person knows his/her diagnosis, can give relevant symptoms, and knows the importance of
medications, then consider a rating of 5.*

## MCAS 9.  Social Acceptability

In general, what are other people's reactions to the client?

Consider this item within the range of the client group instead of the general population. Consider physical appearance, behavior in public situations, and reports from others. If appearance and behavior motivate others to cross to the opposite side of the street, a low rating is required.

**1 = Very negative**               *(Consistently elicits avoidant reaction from others)*
**2 = Fairly negative**              *(Presentation elicits some negative reaction from others)*
**3 = Mixed, mildly negative to mildly positive**
**4 = Fairly positive**              *(Presentation slightly impaired, but can navigate in public*
                                       *without attracting negative attention)*
**5 = Very positive**                *(No outward appearance of mental illness or impairment)*

*** *Basis for rating:*

*Client's general countenance and demeanor during interview.  This includes grooming and clothing, cleanliness, general attitude.  The presence of intrusive behavior; talking or laughing inappropriately; body odor; odd movements or posture would lower the rating on this item.*

*Consider these questions of <u>yourself</u> when rating this item:*

*Would you feel comfortable sitting next to this person on a bus, if you did not know him/her?*
*How would you respond to him/her, seeing him/her in public, if you did not know him/her?*

*CUE TO RATERS:*
*If the person looks grossly "normal," consider a rating of 5.*

**MCAS 10.  Social Interest**

How frequently does the client initiate social contact or respond to others' initiation of social contact?

This item is a measure of **frequency** of social interest **without a judgment of the appropriateness or the quality** of social interactions.

| | |
|---|---|
| **1 = Very infrequently** | *(Almost never participates in social activities; usually avoids available social situations)* |
| **2 = Fairly infrequently** | *(Limited response to invitation or opportunity for social interaction; does not go on recreation outings; e.g., passive interaction with others when smoking)* |
| **3 = Occasionally** | *(Sometimes initiates and responds to social activities; e.g., goes on outings with program which are arranged by staff, may have some withdrawal from others)* |
| **4 = Fairly frequently** | *(Responds consistently and initiates occasionally; e.g., has some social contacts outside of activities which are organized by staff)* |
| **5 = Very frequently** | *(Ongoing initiation and responses to social interactions; e.g., actively maintains social activities outside of household)* |

***\*\*\* Basis for rating:***

*Rate the* <u>*interest*</u> *the client shows in initiating and/or engaging in social activities with others.*

*Consider asking the following questions:*

*How do you spend your free time?  How much time do you spend with other people?*

*Could you describe the types of activities you do with others?*

*How many friends do you have?  Are they close friends?*

*How often do you get together with your friends?  With your family?*

*Do you invite people to get together or do others take the lead?*

*Are there times when your friends or family ask you to go somewhere and you just say 'No'?*

***CUES TO RATERS:***
*Rate what the person actually does, regardless of constraints of money, transportation, etc.*
*If the person has some withdrawal from others, consider a rating of 3.*

**MCAS 11.  Social Effectiveness**

How effectively does the client interact with others? NOTE: "Effectively" refers to how successfully and appropriately the client behaves in social settings, i.e., how well he or she minimizes interpersonal friction, meets personal needs, achieves personal goals in a socially appropriate manner, etc.

Behavior, which is aggressive, intrusive, inappropriate, goal-inappropriate, illegal, immoral, or ridiculous, causes this item to be rated low.

**1 = Very ineffectively**            *(Lacking in almost any social skills; inappropriate response to social cues)*

**2 = Ineffectively**                 *(Uses only minimal social skills, can not engage in give-and-take of instrumental or social conversations; limited response to social cues)*

**3 = Mixed or dubious effectiveness**  *(Marginal social skills, not always appropriate)*

**4 = Effectively**                   *(Is generally able to carry out social interactions with minor deficits, can generally engage in give-and-take conversation with only minor disruption)*

**5 = Very effectively**              *(Social skills are within the normal range)*

*** *Basis for rating:*

*Consider the following when rating this item:*

*Based on your observation, do you think that the client is able to communicate needs in order to get them met?  For example, could they walk into a bank and be able to open a checking account?*

*Is the client able to engage in simple social conversation?  For example, do you think that they could carry on a conversation over a meal or at a social activity?*

*Consider the social skills  - both verbal and nonverbal - of the client that are demonstrated during the interview.*

*If client is intrusive, silly, preoccupied, constricted, this would lower the rating on this item.*

*CUES TO RATERS:*
*Base this rating on the person's behavior during the interview.  Also consider any clear evidence that the person has provided about interactions with others outside of the interview setting.*

**MCAS 12.  Social Network**

How extensive is the client's social support network? NOTE: A support network may consist of interested family, friends, acquaintances, professionals, coworkers, socialization programs, etc. NOTE: Rate the size of the network, not the social acceptability.

**1 = Very limited network**          (Nobody)
**2 = Limited network**                (Family member or Casemanager)
**3 = Moderately extensive network**  (Family member and: a Case Manager or a Friend or a
                                          Socialization group)
**4 = Extensive network**              (Family member and a Case Manager and: a Friend or a
                                          Socialization group)
**5 = Very extensive network**         (Most of the above and close friends or a partner with
                                          some experience of intimacy)

   *-To rate a 5, clients should have close friends or a partner, experience some intimacy.*


**\*\*\*Basis for rating:**

*Consider the following questions:*

*Who are the persons you are closest to?*

*Who do you rely on for emotional support?*

*How often do you have contact with your family?*
                              *...with a counselor or case manager?*
                              *...with friends?*
                              *...with someone special like a boyfriend/girlfriend?*


**CUES TO RATERS:**
*If the person has a romantic relationship, consider a rating of 5.*
*If the person has no contact at all with family, consider a rating of 3.*

**MCAS 13.  Meaningful Activity**

How frequently is the client involved in meaningful activities that are satisfying to him or her?
NOTE: Meaningful activities might include arts and crafts, reading, going to a movie, etc.

-Rate the **client's** perception.

| | |
|---|---|
| **1 = Almost never involved** | *(Does nothing outside of meeting basic needs)* |
| **2 = Seldom involved** | *(May be involved in some passive activities with little enthusiasm)* |
| **3 = Sometimes involved** | *(Does passive activities such as listening to music, watching T.V. with some enthusiasm; at day program has only passive involvement or skips groups)* |
| **4 = Often involved** | *(Has some constructive activities with others which are identified as meaningful; active involvement at day program, may include part-time sheltered work activity at day program)* |
| **5 = Almost always involved** | *(Consistently involved in an interactive activity like work, school, volunteering outside of a sheltered psychiatric setting)* |

***Basis for rating:**

*Consider the following questions:*

*How do you spend your time during the day?  (e.g., day program, job, school)*

*How do you spend a typical day?*

*If at a day program:  What activities do you participate in at your day program?*
        *Do you skip groups sometimes?  Do you tend to be quiet in the groups or do you talk and participate a lot in the groups?*

*Do you have any hobbies or interests?  What do you most enjoy doing?*

**CUE TO RATERS:**
*If the person declines to attend groups at his/her day program, consider a rating of 3.*

**MCAS 14.  Medication Compliance**

How frequently does the client comply with his/her prescribed medication regimen? NOTE: This question does not relate to how much those medications help the client.

| | |
|---|---|
| **1 = Almost never complies** | *(Forced compliance of any medication)* |
| **2 = Infrequently complies** | *(Does not take medication independently; staff directly monitor self-administration of all medications)* |
| **3 = Sometimes complies** | *(Takes medication on own, but misses frequently and/or needs periodic checks, monitoring, or help with packing medications)* |
| **4 = Usually complies** | *(Takes medication perfectly with prompting, or takes medication on their own, but misses occasionally)* |
| **5 = Almost always complies** | *(Takes medication completely independently and compliantly)* |

***Basis for rating:**

*Rate the current medication administration arrangements, not what the client may be capable of.*

*Consider the following questions:*

*Do you take your medication on your own or is it supervised by staff members or your family?*

*(If the person does take medication on his/her own, consider asking: Does anyone ever remind you to take your medication? …Do staff/family help you pack your medications? …How often do you miss a dose of medication or forget to take it?)*

**CUE TO RATERS:**
*If medications are administered directly by staff, or if the person's taking of medications is directly observed by staff, then consider a rating of 2.*

## MCAS 15.  Cooperation with Treatment Providers

How frequently does the client cooperate as demonstrated by, for example, keeping appointments, complying with treatment plans, and following through on reasonable requests?

**1 = Almost never cooperates**     *(Does not cooperate at all with treatment plans or keep appts.)*
**2 = Infrequently cooperates**     *(Non-compliant with treatment efforts; does not follow daily schedule, though may keep some appts.)*
**3 = Sometimes cooperates**     *(Follows through some of the time with daily schedule or other treatment activities; is minimally involved in treatment planning)*
**4 = Usually cooperates**     *(Usually  keeps doctor's appts. and attends day programs on scheduled days; involved in treatment planning)*
**5 = Almost always cooperates**     *(Rarely misses appointments or scheduled activities, actively engaged in treatment planning/goal setting)*


***\*\*\*Basis for rating:***

*Consider the following questions:*

*Do you attend your day program/volunteer job/work all the days you're scheduled to attend?*

*Do you keep all of your clinic/doctor appointments?*

*How about meetings with your case manager?  Do you ever just say, 'Forget it, I'm not going'?*

*What are your treatment/rehab goals?*


***CUES TO RATERS:***
*Cooperating refers mostly to keeping doctor's appointments and attending day program on scheduled days.*
*A person should be able to state and have some understanding of their rehabilitation goals in order to receive a rating of 5.*

**MCAS 16.  Alcohol / Drug Abuse**

How frequently does the client abuse drugs and/or alcohol? NOTE: "Abuse" means use to the extent that it interferes with functioning.

NOTE: Abuse of drugs includes **illegal street drugs** as well as abuse of **over-the-counter and prescribed** medications.

| | |
|---|---|
| **1 = Frequently abuses** | *(Drug/alcohol dependence; daily abuse of alcohol or drugs which causes severe impairment of functioning; inability to function in community secondary to alcohol/drug abuse)* |
| **2 = Often abuses** | *(Recurrent use of alcohol or abuse of drugs which causes significant effect on functioning)* |
| **3 = Sometimes abuses** | *(Some use of alcohol or abuse of drugs with some effect on functioning)* |
| **4 = Infrequently abuses** | *(Occasional use of alcohol or abuse of drugs without impairment)* |
| **5 = Almost never abuses** | *(Abstinence; no use of alcohol or drugs during rating period)* |

***\*\*\*Basis for rating:***

*Consider the following questions:*

*In the past month, have you had anything to drink?  How much?  How often?*

*In the past month, have you used any street drugs?  How often?  How much?*

*In the past month, have you taken any over-the-counter or prescription medications to get high? How often?  How much?*

*Have you ever driven a car, gone to work or school when you have been drinking or using drugs?*

*How has the alcohol/drug use interfered with your day-to-day life?*

## MCAS 17.  Impulse Control

How frequently does the client exhibit episodes of extreme acting out?  NOTE: "Acting out" refers to such behavior as temper outbursts, spending sprees, aggressive actions, suicidal gestures, inappropriate sexual acts, etc.

**1 = Frequently acts out**   *(Frequent and/or severe acting out behavior, e.g., behaviors which could lead to criminal charges)*

**2 = Acts out fairly often**   *(Impulsive acts which are fairly often and/or of moderate severity)*

**3 = Sometimes acts out**   *(Some acting out behavior; moderate severity; at least one episode of behavior that is dangerous or threatening)*

**4 = Infrequently acts out**   *(Maybe one or two lapses of impulse control; minor acting out, such as attention-seeking behavior which is not threatening or dangerous)*

**5 = Almost never acts out**   *(No noteworthy incidents)*

***Basis for rating:**

*Consider asking the client:*

*In the past month, have you had disagreements with others?*
> *If yes: inquire about frequency, severity, time last occurrence, and cause of disagreements/fights and if the disagreement ever got to the point of a physical fight.*

*Have you done anything lately that has annoyed other people?*

*Have you been spending a lot of money lately?*
*Have you tried to hurt yourself in any way?*
*Did you threaten anyone or break things?*

*Have you done anything recently on the spur of the moment that you later regretted?  If yes, were these behaviors ones that other people considered dangerous or not in your best interests? (Consider asking if the person has had significant impulse problems: During the past month, have you been in trouble with the police?)*

**CUE TO RATERS:**
*If the person has verbal arguments with others, consider a rating of 4.*